HELEN GOODMAN, Appellant, v. MAX MARX, Respondent.

Second Department, May 26, 1922.

**Vendor and purchaser — action by assignee of purchaser to recover first payment and money expended in making search — bad faith of vendee in objecting to title immaterial — vendor not required to tender deed executed by him personally where contract does not so obligate him — title not marketable — contract executed by defendant individually — record title in corporation as passive trustee to convey on direction of persons interested — unrecorded deed given by corporation to dummy — on closing day deed executed by dummy with blank grantee presented — judgment against corporation unsatisfied on closing day — search against dummy not brought down to date — no authority shown authorizing defendant as president of corporation to execute deed to dummy — no authority shown authorizing corporation to convey to dummy or authorizing dummy to execute deed in blank — whether valid title was tendered was question of law — instruction that title of dummy was good constituted reversible error — no motion by plaintiff for direction of verdict or objection to submission of case to jury nor evidence as to value of services in searching title — Appellate Division cannot direct judgment for plaintiff.**

The good faith or bad faith of a vendee in objecting to the title tendered to him by the vendor is immaterial if the title is unmarketable.

A vendor is not bound in the performance of his contract to tender a deed executed by himself, personally, where the contract does not so obligate him, but he must deliver a deed from some one conveying a marketable title.

An assignee of a purchaser of real property is entitled to recover the down payment and the reasonable cost of searching title on the ground that the title tendered by the vendor is not marketable, where it appears that the vendor, the president of the corporation holding the record title, executed, personally, the contract of sale; that the corporation holding the record title was acting as a passive trustee for several individuals, including the vendor, under an agreement that the corporation would convey the property as directed by a written direction of the majority in percentage of ownership of the persons interested in the real estate; that the defendant acting as president for the corporation, executed a deed of the property in question to a dummy, without consideration, which deed was not recorded; that on the closing day the vendor presented a deed executed by said dummy with the space for the grantee's name left blank; that on said day there was a judgment standing against the corporation and, though it had been reversed, the reversal was not noted until sometime thereafter, and the search against the dummy grantor which was offered by the vendor had not been brought down to date; that there was no evidence offered to show the authority of the defendant as president of the corporation to execute and deliver the deed to the dummy, and there was no evidence that the corporation as trustee acted under authority given to it pursuant to the agreement by which it held the property to execute the deed to the dummy, nor was it shown that the dummy had authority from said parties interested in the property to execute the deed in blank.

Whether or not the title tendered by the vendor to the vendee was marketable was a question of law and should not have been submitted to the jury.

It was reversible error for the court to instruct the jury that the title of the dummy was as good as any other title in the chain.

While the plaintiff was entitled to recover the down payment and the reasonable cost of searching the title, the Appellate Division cannot direct a judgment for her, as no formal motion was made by the plaintiff for the direction of a verdict, nor any specific objection entered to the submission of the case to the jury, nor was there any evidence as to the reasonable value of the services performed in searching the title.

APPEAL by the plaintiff, Helen Goodman, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 22d day of November, 1921, upon the verdict of a jury, and also from an order entered in said clerk's office on the same day, denying plaintiff's motion for a new trial made upon the minutes.

The plaintiff brought this action as assignee of B. J. Galligan & Co., Inc., a domestic corporation, to recover $7,500, the amount of the first payment made by her assignor upon a contract for the purchase of certain premises upon Broadway in the borough of Manhattan, city of New York, together with $250 expended for searching the title. The contract was dated March 2, 1920, and in it the defendant vendor agreed to sell and convey the premises for the consideration of $400,000, payable $7,500 on the signing of the contract, $225,000 by taking the property subject to a mortgage thereon, the defendant agreeing to procure an extension of the time of payment for three years, $100,000 by the execution

and delivery of a purchase-money mortgage in that amount, and $67,500 in cash on the delivery of the deed. Title was to be closed and the deed delivered on June 3, 1920, at one-thirty o'clock P. M., or sooner, on five days' prior notice by the purchaser. The defendant agreed " to make, execute and deliver, or cause to be made, executed and delivered, a good and sufficient deed to convey to the Purchaser or the Purchaser's assigns, the fee of said premises free from all encumbrances except as herein stated."

At the time and place fixed for closing, the attorney for the vendee appeared and presented certain objections to the title. On the day before — June second — he had written a letter to defendant in which he stated that the record did not show the defendant to be the owner of the property, and requested if the conveyance was to be by someone else, that he might be notified of the name of the grantor so that he might continue his searches. He suggested that June twenty-fifth be set as the day for closing. No answer was received to the letter. When he appeared at the place fixed for closing, adjournment was refused. The attorneys for the vendor produced an agreement extending the time of payment of the first mortgage and a deed of the property executed by the Sound Realty Company, the record owner of the premises, to one Jeremiah F. Donovan, dated October 30, 1919, signed by the Sound Realty Company by the defendant as president, with the corporate seal attached, acknowledged by defendant on behalf of the corporation on November 3, 1919. An instrument in the form of a deed was also produced by the vendor's attorneys, dated and acknowledged June 3, 1920, the closing day, signed by Jeremiah F. Donovan as grantor, but with the name of the grantee left blank. The attorneys for the vendor asserted that they had authority from Mr. Donovan to fill in the name of the grantee in the executed instrument. Mr. Donovan was not present. The attorneys for the defendant vendor refused to adjourn the closing of the title and referred the vendee to the defendant who had an office in the same building. The defendant also refused any adjournment, and upon request made for the return of the deposit of $7,500, also refused. The vendee called attention to the fact that there was a judgment of record against the Sound Realty Company, docketed March 31, 1916, for $307.68, and made objection claiming encroachments by certain cornices on the building on the public street. The representative of the vendor denied the alleged encroachments and stated that the judgment referred to had been reversed. As matter of fact the judgment was still open on the docket on the closing day; the reversal was not noted until June 17, 1920. The attorneys for the vendor also stated that

they had a judgment search against Donovan which they would give to the purchaser. This search was marked in evidence on the trial and showed no judgments against Mr. Donovan, but it was certified on March 24, 1920, and was not brought down to June third, the day of closing. The attorney for the purchaser testified that he was first informed that the deed of the property was to be made by Donovan on the morning of the day fixed for closing, when the vendor's attorney spoke with him on the telephone. He said that he also referred to the fact that there was some claim that the estate of one Bendheim was interested in the property. The vendor's attorney denies that any reference was made to the Bendheim estate. He testified that he was counsel for the estate and that it had no interest in the property. But the contract of sale at the time of execution had been indorsed " O. K." over the signature of the executor of the Bendheim estate, and counsel for the vendor testified that he had required or requested that indorsement, for reasons known to him but not stated. There is no dispute that when the attorney for the vendee attended at the time and place fixed for closing the title, he did not have with him the balance due on the cash payment required by the contract, viz., $67,500, and this fact was stressed by defendant and his attorney at the time. They allege that the attorney for the vendee said that the Galligan Company did not have the money to close the contract, and asked that the $7,500 paid be returned. On the contrary, the representative of the vendee asserts that he objected to the deed executed by Donovan with the name of the grantee left blank, and intimated that he would take a deed of the property executed by the Sound Realty Company and by the Bendheim estate, and that the vendee would be ready to close as soon as the vendor could give good title. But the vendor refused to adjourn the closing for any period, insisting that the title be closed then and there, and the vendee notified him that he would consider such refusal a breach of the contract. On June 3, 1920, Galligan & Co., Inc., duly assigned all its interest in the contract of sale and the moneys due and to become due thereunder to the plaintiff, who it appears had actually furnished the $7,500 already paid on account, and on June 7, 1920, she commenced this action to recover the money paid with $250, the expense of searching the title, alleging that on the law day the defendant was not the owner of the premises and was unable to convey a marketable title. Upon the trial the jury found a verdict for the defendant, and plaintiff appeals.

*Joseph A. Seidman,* for the appellant.

*Yorke Allen,* for the respondent.

Kelly, J.:

At the close of the plaintiff's case the defendant moved for a nonsuit upon the ground that plaintiff had failed to make a *prima facie* case, and failed to prove the existence of any defects warranting the rejection of the title, and that it being admitted that the vendee had made no tender of $67,500, the balance of cash payment due on closing title, plaintiff could not maintain the action. The learned trial justice reserved decision upon the motion and defendant proceeded with his defense. At the conclusion of the testimony the defendant renewed his motion to dismiss the complaint upon the grounds already stated. The learned trial justice again reserved decision and suggested that both parties move for judgment. Counsel for plaintiff said there might be a question of fact as to what transpired on June third and suggested that the court reserve decision on all questions and submit to the jury the question of fact as to what transpired on June third. The court declined to do this. He said that if the jury was to pass upon the case he would send " the whole thing to them." He stated that in his opinion it seemed absolutely a question for the court, and added: " If you both want to move for judgment, or the direction of a verdict rather, I will take it under consideration and you can submit your briefs." To this the attorney for the plaintiff answered, " I am perfectly satisfied," but the defendant's attorney said he had no authority to do that; that he did not move for a direction but for a dismissal. The court replied, " Decision reserved on the motion to dismiss."

The learned trial justice charged the jury as follows: " There were several objections raised to the title. The defendant says that all of those objections could and would have been explained and cleared up on the closing. The defendant was simply obliged to perform the contract." Again the learned judge said: " In regard to the alleged defects of title, the question is were they raised in good faith, were they material, were they such that called for an explanation on the part of this defendant? Did the defendant give the plaintiff a reasonable opportunity for investigation and inspection? Was the defendant at the time of closing in a position to give a title which was called for in the contract, and to explain any ambiguities, anything that needed explanation, to correct any either real or apparent record defects, to put the plaintiff in a position to take over and become the owner of that real estate according to the terms of the contract which will be given to you, and which you must read in order to understand the position of each ? " He told the jury to say whether plaintiff had convinced them that the defendant " breached the contract," and if so he

said she was entitled to recover $7,500, the deposit, and $150 expense of searching title. And he said in conclusion: " If, however, you find that the proof is not such, that the breach was not on the part of the defendant, but on the other hand was on the part of the plaintiff, or some excuse here that has not been explained, some reason that has not been disclosed to you, by the same token your verdict must be for the defendant."

I have quoted the charge of the learned judge at some length in order to show that this common-law jury was saddled with rather weighty responsibility. They were told at the outset of the charge that the case turned on the question whether the plaintiff (vendee) went to the place of closing for the purpose of closing title and whether the objections were raised in good faith.

But if the title was unmarketable, I venture to suggest that the good faith or bad faith of the vendee was entirely immaterial. (*Roberts* v. *New York Life Insurance Co.*, 195 App. Div. 97, 101, and cases cited.) The plaintiff's assignee had performed the contract by paying the first installment of $7,500, and on the closing day was entitled under the terms of the contract to a deed transferring a marketable title. (*Chesebro* v. *Moers*, 233 N. Y. 75.) On the record here the defendant vendor did not tender such a deed and was unable to transfer a marketable title. He refused adjournment and stood strictly upon the contract. Measured by that standard he was unable to perform. The learned judge told the jury that under the contract, defendant Marx was not obliged to tender a deed executed by him personally, and he was undoubtedly right. But the obligation was on him to deliver a deed from someone conveying a marketable title. The transaction involved a considerable sum of money. At the time fixed for closing the record title to the premises was in the Sound Realty Company, but subject to the lien of an unsatisfied judgment against that company. The vendor produced an unrecorded deed dated October 30, 1919, from the Sound Realty Company to Donovan, who is said to have been one of the products of modern progressive methods of conveyancing known as a " dummy." But the deed to the " dummy " was incumbered by the judgment. Mr. Donovan was not present, but the attorney for the vendor produced what purported to be a deed dated, executed and acknowledged by him on June 3, 1920, conveying the premises to no one. The name of the grantee was blank. The attorney testified: " After that I told him that I had the deed from the Sound Realty Co. to Donovan, and had it from Donovan to their name in blank, if he would let me know what name he wanted filled in I would fill in that name. * * * I had authority from Donovan to fill in the name of the

grantee." The parties were in a court of law. The defendant had insisted on the letter of the contract, refusing all requests for postponement. What " authority " the attorney possessed to alter the instrument executed and acknowledged by Donovan, by inserting therein the name of a grantee, is not suggested. It will be noted that this instrument is printed in the record as one of defendant's exhibits on the trial, and it appears that someone at some time inserted in the blank space the name of the defendant as grantee and that the alleged deed was recorded on December 23, 1920. The defendant Mr. Marx is the same person who signed the deed from the Sound Realty Company to Donovan in October, 1919, as president of the corporation. By the filling in of his name in the blank space in the instrument executed by Donovan, the title to the property, valued apparently at $400,000, is conveyed from the corporation through Mr. Donovan, the " dummy," to the president of the corporation individually. When in October, 1919, Mr. Marx, as president, signed the deed from the Sound Realty Company to Donovan, the acknowledgment or proof shows that he made oath that the seal of the corporation was affixed to the deed and that he signed his name thereto " by order of the board of Directors of said corporation." Mr. Marx's testimony was offered as a part of plaintiff's case in chief. He was out of the country and his evidence had been taken by deposition. He says he thinks he resigned as president of the Sound Realty Company, but when asked for the precise date replies, " God only knows." He could not remember any meeting of the directors at which he was authorized to sign and deliver the deed of the property to Mr. Donovan. He said that when he resigned there was no president. " Q. The company was dissolved ? A. There was no president. Q. Who was vice-president * * *? A. I could not say. Q. Did you have a vice-president ? A. Yes, but they all died, they went to hell or to heaven. I know they were dying by the quantity. Q. At any rate, you did not see these people between March 3, 1920, and June 3, 1920, at any of the meetings of the directors of the Sound Realty Co. held in your office ? A. Oh, I have seen lots of these people; they all come from time to time, but I don't recollect any particular meeting. Q. Did you ever discuss with them the conveyance of this property ? A. * * * I am sure I discussed it with some of them. Q. Did you do it at directors' meetings ? A. God only can remember that." But it seems to me that where a deed of corporate real estate is made by a corporation to a so-called " dummy " without consideration, who thereafter executes an alleged deed of the same real estate with the name of the grantee left blank, and it is proposed to insert a name after execution and

acknowledgment of the instrument, a name furnished by the president or former president of the corporation to carry out his individual contract, and it appears that thereafter the name of the president or former president has been inserted as grantee, I think in such case a purchaser is entitled to an explanation of these things and proof of authority from the corporation and that the statement of the defendant, " God only knows that," is not sufficient security to a purchaser of a $400,000 parcel of real estate on which he has already paid $7,500 cash and is required to pay an additional $67,500 cash. There was no evidence in the case of authority to the defendant as president of the corporation to execute and deliver the deed to Donovan.

But there is another serious question affecting the marketability of this title. The contract for the sale of this real estate bore an indorsement or mark " O. K." signed by an executor of the Bendheim estate, and Mr. Mark, the attorney for the vendor, said it was put in the contract at his suggestion. He was asked whether he knew the Bendheim's connection with the property, and replied, " I knew what was the cause of my requiring or requesting Bendheim's O. K. on this contract." He was not asked the cause. He denied that the Bendheim estate had any interest in the property. He said the Sound Realty Company was the record owner on June 3, 1920.

The defendant offered in evidence an agreement dated November 15, 1907, between Nathan Wise, John C. Rodgers, Adolph M. Bendheim, Julius G. Miller and Max Marx of the first part, and the Sound Realty Company of the second part. (The " O. K." on the contract for the sale of the property was signed by the executor of Adolph M. Bendheim, one of the parties of the first part to the agreement.) It recites that pursuant to a contract dated November 6, 1907, one Emma L. Jacob has agreed to convey the premises on Broadway (which are the subject of the contract in the case at bar) to Rodgers, Bendheim, Marx and Wise, who with Julius Miller are the parties of the first part. It recites that the five parties of the first part have agreed to " participate in the above mentioned property," Wise to the extent of twenty-five per cent, Rodgers twenty per cent, Bendheim thirty per cent, Miller five per cent and Marx twenty per cent; that the parties named have paid and liquidated the cost price in accordance with their ratio of participation, and that they are about to cause the premises to be conveyed to the Sound Realty Company. The Sound Realty Company consents to accept the title and covenants to convey the premises to the parties of the first part or to any other person or persons " pursuant to the written direction of a

majority in percentage of ownership of the parties of the first part, or of the executors or administrators of the majority of percentage in ownership of said parties of the first part, which written direction shall be executed and acknowledged in the same manner as a deed for real property, intended to be recorded in the County of New York." Any proceeds of sale are to be disposed of by like written direction. In case any of the parties of the first part die, their executors or administrators shall continue to represent the share of the deceased.

It is not disputed that Galligan & Co., plaintiff's assignor, had actual notice of this agreement at the time the contract was signed. The defendant Marx told him that Bendheim, one of the parties of the first part, was dead and that he, Marx, could not get along with young Bendheim; that this was one of the last pieces of property that he was still interested in with Bendheim. Seidman, the plaintiff's attorney, who represented the purchaser, testified that he was told by Mark (the lawyer for the vendors) that this was the first time they represented Marx and it was because of the Bendheim interests, and it will be remembered that Mr. Mark, called by plaintiff, testified: " I am Counsel for the Bendheim Estate." And referring to the " O. K." on the contract, says: " The O. K. was put on at my suggestion."

It would appear, therefore, that the Sound Realty Company held this title under a passive trust and that it had covenanted that it would convey the property only on written direction of the parties interested, executed and acknowledged as a deed. But there is no evidence of authority to the trustee to execute the deed to Mr. Donovan, the " dummy," nor is there evidence of authority to Donovan to execute and deliver a deed in blank. There is no evidence of authority for a conveyance of the property to Max Marx individually, one of the parties of the first part, whose interest was stated to be but twenty per cent, and who signed the trust agreement on behalf of the Sound Realty Company as president. I think the title tendered by defendant was unmarketable. (Real Prop. Law, §§ 92, 93; *Sinnott* v. *McLaughlin,* 198 App. Div. 630.)

But the learned trial justice submitted the case to the jury not only upon the question of the good faith of the parties, but it seems to me he went further than this. He submitted to them the question whether the vendee " went there for the purpose of closing the title, or whether the vendee did not, and whether these objections which are raised to that title are raised in good faith, whether they are real legal objections, or whether they are simply put in here for the purpose of confusing you, or as an excuse for failure to perform the contract. Who breached the contract? If the defend-

ant alone breached the contract, it was no fault on the part of the plaintiff, if the plaintiff was ready, willing and able to perform, then upon that breach the plaintiff is entitled to recover the amount of deposit and the reasonable costs of the search, and if that is not proven, as I have stated, by the fair weight of the true, believable, probable facts here, your verdict must be for the defendant."

It is evident that these were questions for the court and not for the jury. The learned justice was right when he suggested to counsel at the close of the testimony that they should both move for the direction of a verdict because it seemed to him that the question was for the court to decide. He said, " If you both want to move for judgment, or the direction of a verdict rather, I will take it under consideration and you can submit your briefs." The plaintiff at once accepted the suggestion, but defendant said he did not move for the direction of a verdict but for a dismissal of the complaint.

I cannot see how the jury could determine these questions. And that they had some difficulty is apparent, because they came back after recess and asked: " Is Donovan's, a dummy title, a good title ?" The following appears from the record: " The Court: Do you want me to answer that question now? The Jury: Yes, sir. The Court: I understand by the question that you want to know whether a dummy title is a good title. Donovan's title in this case, as far as you are concerned, is as good as any other title in the chain of title, if found as I have already charged. By Mr. Seidman: Exception. The Court: In other words, whether a man is a dummy or not, other things being equal, and the title being perfected without defects, it is just as good as any other title. By Mr. Seidman: Exception. I call your Honor's attention to Section 105 of the Real Property Law, and section 63,* that before your Honor gives this final direction I would like to have your Honor send for this. I tried to get it from the law library. I don't want to argue that because it would not be proper for me to argue now in view of your Honor's remark. By Mr. Allen: I object to the discussion. By Mr. Seidman: I am not attempting to argue. Your Honor will excuse the jury a minute, I think. If you will read this, you will find that in this case Donovan had no title. Not only didn't Donovan have any title, but the Sound Realty Company didn't have any title, because — The Court: In this chain we have the title back in Max Marx, and I charge that it is just as good as any other deed in the chain of title, and you have your exception. By Mr. Seidman: May I ask your Honor to

---

* Respectively amd. by Laws of 1918, chap. 403, and Laws of 1916, chap. 364. — [REP.

Second Department, May, 1922.                    [Vol. 201

charge the jury — The Court: I will refuse any requests to charge. By Mr. Seidman: I take an exception. The Jury retires. The Jury returns to Court-room. Clerk of Court: Gentlemen of the Jury have you agreed upon a verdict? By Mr. Seidman: Before the Jury makes an announcement as to the verdict in this case, I ask your Honor to submit to the jury the question as to whether the plaintiff in this case acted in good faith at the time fixed for the closing of title, whether at that time the plaintiff in good faith intended to carry out the contract by her assignor in this case. The Court: I have already submitted that with other requests. You have that special request in here; it has already been submitted to them with others. I refuse now and give you an exception. By Mr. Seidman: Your Honor doesn't permit me to finish what I wanted to say. The Court: Go ahead. By Mr. Seidman: In view of your Honor's answer to the question as to Donovan's title, that is a question that if your Honor has made an error, or if any error has been committed, your Honor can still correct it, of course, either on motion for the direction of a verdict, or on motion for judgment, that question being purely a question of law can be disposed of without the aid or assistance of the jury. But there is one question that has not been submitted to the jury, and if their verdict in this case would be one way or the other it might result in answering that question affirmatively one way or the other; where the fact may be that the jurors' verdict is solely based on the answer given by the Court; that deprives the plaintiff, and it may deprive the defendant of the right which they have which should be passed upon in a proper way. We want to know how the jury passed on that particular question. The Court: Refused except as already charged. I am not going into it any further. You can take it up on appeal. By Mr. Seidman: Exception. Clerk of the Court: Gentlemen of the Jury: Have you agreed upon a verdict? The Jury: We have. Clerk of the Court: How do you find? The Jury: We find a verdict in favor of the Defendant."

I think the exception to the instruction, " Donovan's title in this case, so far as you are concerned, is as good as any other title in the chain of title, if found as I have already charged," presents reversible error.

While I think the title offered by the defendant on June 3, 1920, was unmarketable and that the plaintiff was entitled to recover the $7,500 paid on the contract and the reasonable cost of searching the title, the condition of the record is such that this court cannot direct judgment in plaintiff's favor. There was no formal motion by plaintiff for the direction of a verdict or specific objection to

the submission of the case to the jury, nor do I find any evidence of the reasonable value of the services in searching the title. The case must, therefore, go back for a new trial.

The judgment and order appealed from should be reversed upon the law and the facts, and a new trial granted, with costs to the appellant to abide the event.

Blackmar, P. J., Rich, Jaycox and Young, JJ., concur.

Judgment and order reversed upon the law and the facts, and a new trial granted, with costs to appellant to abide the event.